## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

———————————————

**PARIS PEÑA LEE**,

      Plaintiff,

        vs.                                      No. 2:22-CV-00960-WJ-GBW

**CITY OF LAS CRUCES, ANDREW LAZARIN,**
**CHRISTOPHER BAKER, ALEXIS RODRIGUEZ,**
**and CHRISTIAN VITALE, in their individual capacities**,[1]

      Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**THIS MATTER** is before the Court on Defendants' five motions for partial summary judgment (**Docs. 75, 77, 78, 79, 80**). Collectively, these motions seek summary judgment on all eleven of Plaintiff Peña-Lee's claims. After reviewing the parties' motions, exhibits, and the applicable law, the Court rules as follows:

- The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's Unreasonable Seizure Claims (**Doc. 75**).

- The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's False Arrest and Battery Claims (**Doc. 77**).

- The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's Malicious Prosecution and Abuse of Process Claims (**Doc. 78**).

---

[1] This is (perhaps) a minor point, but it warrants some discussion. When the Complaint was removed to federal court (**Doc. 1**), Andrew Walker was a named Defendant. Since then, however, Plaintiff filed a First Amended Complaint (**Doc. 39**)—one which no longer names Andrew Walker as a Defendant. Even so, the captions of the parties' filings differ. *Compare* **Docs. 75, 77, 78, 79, 80**, *with* **Doc. 103**. Defendants' caption is stylized as: "PARIS PENA LEE v. CITY OF LAS CRUCES, ANDREW LAZARIN, CHRISTOPHER BAKER, ALEXIS RODRIGUEZ, and CHRISTIAN VITALE . . . ." *E.g.*, **Doc. 75 at 1**. But Plaintiff's Response (**Doc. 103**) contains those Defendants—as well as "ANDREW WALKER." *Id.* **at 1**.

    Because Andrew Walker is no longer a named Defendant—by virtue of Plaintiff's FAC (**Doc. 39**)—the Court does not include him in the caption.

- The Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment on Plaintiff's Americans with Disabilities ("ADA") Claims (**Doc. 79**).

- The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's Negligent Supervision Claims (**Doc. 80**).

A more detailed explanation of the Court's rulings is outlined below.

## BACKGROUND[2]

This case stems from Plaintiff Peña-Lee's arrest by officers of the Las Cruces Police Department ("LCPD") on October 2, 2021—an arrest which she alleges was improper because it was based on visible signs of her seizure disorder.

## I. LCPD Officer Training:

Las Cruces Police Department officers undergo comprehensive training covering various aspects of law enforcement, such as investigations, detention, arrests, and interactions with members of the public. **Doc. 80-2 at 10 (Exhibit N, at 10)**. Their preparation begins with the Police Academy followed by 14 weeks of Field Training Officer ("FTO") training, providing foundational knowledge and practical experience. **Doc. 80-4 at 3 (Exhibit P, at 3)**. Officers receive approximately one week of specialized instruction on Driving While Intoxicated ("DWI") investigations. **Doc. 80-5 at 5 (Exhibit Q, at 5)**. This includes learning standardized field sobriety tests ("SFSTs"), operating the Intoxilyzer machine, and participating in wet labs (where volunteers at different intoxication levels provide a realistic training environment for officers). *Id.*

---

[2] The Court takes the background facts from the parties' briefs. The facts are supported by evidence in the record as stated by the parties. Thus, the background facts are either undisputed, or, where genuinely disputed, are viewed in the light most favorable to Plaintiff. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 964 (10th Cir. 2022). Additionally, the parties raised materiality/relevancy objections to one another's facts. The facts included here have been deemed to be material by the Court and are not disputed unless otherwise noted.

During DWI investigations, officers are trained to assess suspects by observing their eyes, speech, body language, and any detectable odors. Officers are prepared to make accommodations to the SFSTs when necessary. **Ex. Q. at 21**. They are also trained to evaluate the totality of circumstances, considering factors such as a suspect's age, environmental conditions, location, injuries, or physical ailments. **Doc. 80-7 at 291 (Exhibit S at 291)**. If drug use is suspected instead of alcohol, officers are instructed to contact a Drug Recognition Expert (DRE) for further evaluation. **Ex. Q. at 18**.

Las Cruces Police Department officers receive guidance from district attorneys on how to prosecute cases—a skill reinforced through in-field training. **Ex. Q. at 7**; **Doc. 80-6 at 7 (Exhibit R at 7)**. Some officers also participate in Advanced Roadside Impaired Driving Enforcement ("ARIDE") training, which touches on how certain impairments can cause signs of impairments, such as head injuries. **Doc. 80-3 at 5 (Exhibit O at 5)**. Recognizing the importance of accommodating individuals with disabilities, officers are trained to assist those who are blind and deaf. **Ex. P. at 19**; **Doc. 80-8 at 38–41 (Exhibit T at 38–41)**. In situations involving medical emergencies, they are instructed to contact appropriate medical personnel and provide essential information to ensure appropriate assistance. **Ex. Q. at 23**.

Las Cruces Police Department officers are expected to follow legal procedures carefully, including the requirement to arrest without a warrant only when probable cause exists. **Ex. N. at 3**. Officers are also trained on handling situations involving individuals with mental illnesses and disabilities. *See generally* **Doc. 79-1 (Exhibit J); Doc. 79-2 (Exhibit K)**.

**II. Events on October 2, 2021:**

On October 2, 2021, a 911 caller reported she discovered a child in the middle of the parking lot near the Family Dollar in Las Cruces, New Mexico. **Doc. 75-1 at 2 (Exhibit A at 2)**.

According to the caller, the child said her mother was passed out in the vehicle. *Id.* Las Cruces Police Department Officers Andrew Lazarin and Christian Vitale responded to the call. *Id.* Officer Lazarin arrived on-scene first and spoke with two witnesses. *Id.* The first witness reported how she saw Plaintiff Peña-Lee's daughter running from Plaintiff's vehicle towards a busy intersection and pointed out Plaintiff's vehicle, an older model suburban SUV bearing license plate number 4466WFK. *Id.* The second witness reported how he saw Plaintiff unconscious and drooling, and later observed her crawling out of the backseat of her vehicle upon waking. *Id.*

Officer Lazarin then ran to catch up with Plaintiff's vehicle—which was driving out of the parking lot. **Ex. A at 2**. Once he caught up, Officer Lazarin began banging the rear driver's side of the vehicle and yelling "Ma'am." **Ex. C. at 01:39–01:52**. Plaintiff Peña-Lee did not stop the vehicle. *Id.* Officer Christian Vitale pulled into the same area where Plaintiff Peña-Lee was driving away. **Ex. A at 2**. Officer Lazarin then told Officer Vitale via his radio to stop Plaintiff's vehicle and stopped Plaintiff Peña-Lee's by getting out of his vehicle and instructing her to stop. *Id.*; **Ex. D at 00:11–00:16**. After stopping her, Officer Lazarin ordered Plaintiff Peña-Lee out of the vehicle. *Id.*; **Ex. C. at 02:10–02:18**.

Once Plaintiff exited the vehicle, Officer Lazarin explained to her how she completely ignored him when he tried stopping her. *Id.* Plaintiff stated that she did not see him. *Id.*; **Ex. C. at 02:18–02:35**. Officer Lazarin told Plaintiff that two witnesses saw her daughter exit the vehicle. *Id.* Plaintiff responded that she did not let her daughter "run away over there," and assured Officer Lazarin that her daughter was with her the whole time. *Id.*; **Ex. C. at 02:35–3:00**. Officer Lazarin informed Plaintiff that witnesses had also reported seeing her unconscious and drooling in her vehicle—at which time Officer Lazarin then asked if she was having a medical emergency. *Id.* Plaintiff responded "No." *Id.*; **Ex. C. at 03:00–03:16**.

Plaintiff asked Officer Lazarin to retrieve her shoes from the vehicle. *Id.* After doing so, he informed her that her daughter could not sit in the front seat. *Id.* Plaintiff responded, "[o]h," and asked to sit down. **Ex. C. at 03:16–04:20**.

While seated on the curb, Plaintiff told Officer Lazarin she was very tired and worked at night. *Id.* **at 04:20–05:15**. When asked where she worked, she initially could not remember but later said Pic Quik. *Id.* **at 05:15–05:29**. Plaintiff denied taking drugs or alcohol that day. *Id.* And when Officer Lazarin asked why she was parked in the shopping center, Plaintiff gave no answer. *Id.* **at 05:29–05:55**.

Officer Lazarin expressed doubts about Plaintiff Peña-Lee's truthfulness—noting her statements about her daughter conflicted with accounts from multiple witnesses. *Id.* **at 09:00–09:20**. In response, Plaintiff acknowledged, "maybe I did fall asleep," but maintained her belief that her daughter had not left the car. *Id.* **at 08:23–09:00**. As the conversation progressed, Officer Lazarin again questioned her reason for being at the shopping center. *Id.* **at 09:20–10:45**. Plaintiff replied, "I don't know why she got out." *Id.*

Officer Lazarin noted Plaintiff Peña-Lee's slow speech, droopy eyes, and overall behavior—explaining that he wanted to conduct a field sobriety test ("FST") to ensure she was safe to drive. *Id.* Plaintiff acknowledged knowing what FSTs are. *Id.* However, when Officer Lazarin asked if she would submit to the tests, she responded, "[w]hat tests?" *Id.* After he repeated his request, Plaintiff agreed to perform the tests but asked if someone could pick her up instead. *Id.*

Before performing the SFSTs, Plaintiff Peña-Lee remarked, "[m]aybe I did pass out," suggesting she might need sugar and mentioning she has seizures. *Id.* **at 13:31–14:25**. When asked if she took medication for her seizures, Plaintiff denied it. *Id.*

Officer Lazarin asked Plaintiff if she would move to a different area to complete the SFST. *Id.* **at 14:25–15:01**. Plaintiff requested a more private location, but since they were in an open shopping center, no alternative was available. *Id.* Officer Lazarin assured her that the purpose of the SFST was not to embarrass her, but to ensure she was safe to drive. *Id.* Plaintiff acknowledged she probably would not be okay to drive, then stood up and sat back down. *Id.*

Officer Vitale then asked Plaintiff if she wanted the Fire Department to check on her. *Id.* **at 15:01–15:44**. Plaintiff responded, "for what?" *Id.* Officer Lazarin reminded her that she had mentioned possibly passing out and suggested she be evaluated by the Fire Department if she wasn't feeling well. *Id.* Plaintiff agreed, saying, "probably so." *Id.* Officer Lazarin explained that she would still need to complete the SFST after receiving medical attention. *Id.*

Sergeant Baker called the Fire Department, and the officers stood by waiting for medical personnel. *Id.* **at 15:44–16:00.**

While awaiting the Fire Department, Sergeant Baker interviewed Marissa Banegas and Elijah Rodriguez, who witnessed Plaintiff's daughter running through the parking lot. *Id.* **at 19:23–21:55**. The witnesses described how another individual, a woman employed at the shopping center, heard screaming coming from Plaintiff's car. *Id.* Ms. Banegas then checked on Plaintiff and found her unconscious and drooling in the car. *Id.* Ms. Banegas informed Plaintiff Peña-Lee that her daughter was outside the vehicle and inquired if she was alright. *Id.* According to Ms. Banegas, Plaintiff had difficulty waking up and eventually crawled out of the car to go to her daughter. *Id.*

While waiting for the Fire Department, Officer Lazarin spoke with Plaintiff. *Id.* He informed her that the officers were awaiting her medical evaluation and would proceed with the SFST if she was cleared. *Id.* Plaintiff requested that the officers contact her boyfriend, Nick Medina, explaining that he could clarify her history of seizures and "confirm that is what

happened." *Id.* Officer Lazarin asked for Mr. Medina's phone number and date of birth. *Id.* After a brief pause, Plaintiff took a moment to consider and then provided the requested information to Officer Lazarin. *Id.*

Once paramedics arrived, Sergeant Baker explained to paramedics that Plaintiff reported a history of seizures, that her blood sugar was low, but that she was not a diabetic. **Ex. E. at 17:31– 17:56**; **Doc. 103-16 at 3 (Exhibit 21 at 3)**. Sergeant Baker explained that Plaintiff appeared disoriented, had been found unconscious behind the wheel, exhibited slurred speech, and might be impaired. *Id.* The paramedics reported that Plaintiff's vital signs and blood sugar levels were normal. **Ex. A. at 3***;* **Ex. 21 at 4**. After being evaluated on-scene, Plaintiff declined to go to the hospital and signed documentation refusing transport. **Ex. E. at 17:31–17:56; 18:35–20:15; Ex. 21 at 3 & 9**. Once Plaintiff was medically cleared, Officer Lazarin asked her to stand up to complete the SFST. **Ex. C. at 22:25–31:12**.

For the first test, Officer Lazarin instructed Plaintiff to face him, remove her glasses, and hold them at her side. *Id.* Plaintiff followed the instruction to remove her glasses but then turned away, prompting Officer Lazarin to repeat his request for her to face him. *Id.* He then directed her to follow his pen with her eyes only. *Id.* Plaintiff acknowledged the instructions and mentioned to Officer Lazarin that she had a lazy eye. *Id.* He proceeded with the test. *Id.*

During the test, Officer Lazarin observed a noticeable lack of smooth pursuit in Plaintiff's left eye, but no issues were detected in her right eye. **Ex. A. at 3**. Additionally, he did not observe any distinct or sustained nystagmus at maximum deviation in either of Plaintiff's eyes. *Id.*

After the first test, Plaintiff asked if she could sit down because she was a little dizzy. **Ex. C. at 31:26–31:57**.

After Plaintiff sat down and stood up for the next test, Officer Lazarin instructed her to take nine steps forward, make a small turn, and walk back while keeping her hands at her sides, counting the steps aloud, and looking down at her feet—the "walk and turn test." *Id.* **at 32:30–37:10**. During the instructions, Plaintiff failed to maintain the correct position and began the test before Officer Lazarin gave the signal. *Id.* She also interrupted Officer Lazarin to ask for water. *Id.* Officer Lazarin explained he could not provide her with anything. *Id.* Plaintiff then requested that Officer Lazarin repeat the instructions. *Id.* After demonstrating the test, Officer Lazarin had to remind Plaintiff during the test to look at her feet and count the steps aloud. *Id.*

While observing the test, Officer Lazarin noted Plaintiff took an incorrect number of steps. **Ex. A. at 3**. After completing the first nine steps, she took an additional three steps during the turn. *Id.* Plaintiff also failed to perform the steps properly—by not bringing her heels to her toes, as required. *Id.*

Officer Lazarin then proceeded with the one-leg stand test. *Id.* He instructed Plaintiff to stand with her feet together, arms at her sides, and to keep her posture straight—then demonstrating the test for her. *Id.* Plaintiff confirmed that she understood the instructions. *Id.*

During the test, Officer Lazarin observed that Plaintiff was not performing it correctly. *Id.* She did not look at her elevated foot and was swaying at the start of the test. *Id.* After 30 seconds, Plaintiff completed the one-leg stand, and Officer Lazarin instructed her to relax. *Id.*

After completing the SFST, Officer Lazarin placed Plaintiff under arrest for driving under the influence. **Ex. C. at 40:07–41:40**. Sergeant Baker informed Plaintiff that someone would need to pick up her daughter. *Id.* Plaintiff said that Officer Lazarin could contact her boyfriend. *Id.* Officer-Trainee Telles escorted Plaintiff to the back of Officer Lazarin's police unit. *Id.*

8

Officer Lazarin called Mr. Medina to inform him that Plaintiff had been arrested for driving under the influence and asked if he could pick up Plaintiff's daughter from the scene. *Id.* **at 43:20–44:46**. Plaintiff then requested to call her employer. **Ex. E. at 46:45–48:44**. After Plaintiff provided Sergeant Baker with an incorrect phone number, Sergeant Baker dialed the correct number for Plaintiff's employer, and Plaintiff spoke with an employee to notify them that she could not make her shift. *Id.*

 Once Mr. Medina arrived at the scene, Medina collected Plaintiff's daughter and her valuables. **Ex. C. at 57:25–1:00:22**. Mr. Medina also questioned what Plaintiff was doing and how she was pulled over by the police. *Id.* Plaintiff stated she had a seizure and when she woke up, the police were around her. *Id.* Plaintiff denied having any alcohol. *Id.* Mr. Medina told officers that Plaintiff works a lot of hours and that she might have had a seizure. *Id.* When Officer Lazarin told Medina that he could not give Mr. Medina any information about the investigation, Medina said "[y]a'll are full of [expletive]" and told Plaintiff he would get her out. *Id.* Medina then left with Plaintiff's daughter. *Id.*

Upon arriving at the LCPD police station, Plaintiff asked if she would be free to go if she blew a zero. **Ex. C. at 1:12:23–1:18:45; 1:53:59–1:54:12**. Officer Lazarin informed her that she would still be under arrest. *Id.* Plaintiff agreed to take the breathalyzer test. *Id.* Officer Lazarin then explained the process: she would take the breathalyzer after a 20-minute waiting period, followed by transport to the detention center. *Id.* After discovering that the LCPD's breathalyzer certification had expired, Officer Lazarin asked if Plaintiff would consent to a blood test, which she refused. *Id.* **at 1:22:50–1:47:05**.

Officers Lazarin and Vitale then escorted Plaintiff to a Doña Ana County Sheriff's station to conduct the breath test. *Id.* Officer Lazarin read Plaintiff the New Mexico Implied Consent Act

prior to conducting a breathalyzer test. *Id.* Officer Vitale conducted the breath test which indicated a 0.0 blood alcohol content. *Id.* Plaintiff again refused to take a blood test. *Id.*

Officer Lazarin then contacted his supervisor, Sergeant Rodriguez, to report that the breath test resulted in a 0.0 blood alcohol content and to request permission to call a Drug Recognition Expert ("DRE"), which Sergeant Rodriguez approved. *Id.* **at 1:57:33–0:57:45; 1:58:27–1:59:14**. DRE Sergeant Andrew Walker returned Officer Lazarin's call after the request to speak with him. *Id.* Officer Lazarin informed Sergeant Walker that Plaintiff's breathalyzer result was 0.0 and that she had not admitted to consuming any alcohol or drugs. *Id.* **at 2:02:10–2:05:00**. Officer Lazarin also relayed his observations from the on-scene investigation. *Id.* However, Sergeant Walker was off-duty and unavailable to come to the Doña Ana County Sheriff's station to conduct an evaluation. *Id.*

Officer Lazarin proceeded to charge Plaintiff Peña-Lee with impaired driving to the slightest degree. *Id.* Following a phone call with DRE Sergeant Walker, Plaintiff Peña-Lee inquired about the sergeant on-duty at the time. *Id.* Officer Lazarin offered to have a supervisor speak with Plaintiff, but she declined. *Id.* **at 2:05:10–2:05:35**. Plaintiff then informed Officer Lazarin that she was feeling dizzy. *Id.* Officer Lazarin asked if she needed water and whether she felt she might vomit. *Id.* **at 2:30:30–2:34:45**. Plaintiff sat on the floor, and Officer Lazarin again asked if she wanted an ambulance, which Plaintiff declined. *Id.* Plaintiff then lied on the floor, and Officer Lazarin removed her handcuffs. *Id.* Plaintiff began moaning and shaking while lying on the floor, *id.*, so Defendant Vitale called for paramedics. *Id.* The paramedics arrived shortly after, assessed Plaintiff, and confirmed her vitals were stable. *Id.* Plaintiff did not go to the hospital, and Defendant Lazarin signed the refusal of consent. *Id.* Officer Lazarin offered her water and informed her that her driver's license privileges would be revoked due to the charge. *Id.* Officer

Lazarin then transported Plaintiff to the Doña Ana Detention Center and released her into the custody of the detention center. **Ex. B. at 2:42:31-2:48:00.**

The following day, on October 3, 2021, Doña Ana Magistrate Judge Joel Cano ordered Plaintiff Peña-Lee released from custody and did not make any written showing of a finding of probable cause pursuant to Rule 6-203(C)(2). **Doc. 103-29** (**Exhibit 29**).

Defendant Lazarin filed a Criminal Complaint against Plaintiff on October 4, 2021. **Doc. 103-27** (**Exhibit 27**). On March 4, 2022, the Third Judicial District Attorney's Office filed a *nolle prosequi* for Plaintiff's charge. **Doc. 75-3** (**Exhibit H**). The basis for dismissal was that "the facts of the case do not meet the elements of the charge." *Id.*

**III. Plaintiff's Seizure Disorder:**

Plaintiff has a diagnosed seizure disorder and has seizures. **Doc. 103-19 (Doc. 24)**. She also has a valid Class D Non-Commercial driver's license that was issued on September 1, 2017, and expires on September 1, 2025. **Doc. 78-1 at 4 (Exhibit I at 4)**. Plaintiff's driver's license has "B restrictions"—which means corrective lenses. *Id.* **at 2**. When Plaintiff obtained her driver's license, she did not submit a medical form to the New Mexico Motor Vehicle Division informing them that she has seizures. *Id.* **at 3**. As such, Plaintiff's driver's license does not have any restrictions to indicate she has a seizure disorder. *Id.*

With regards to seizures, the postictal period occurs after someone has a seizure. **Doc. 103-13 at 1** (**Exhibit 13 at 1**). During this period, a person suffers from severe cognitive problems while the brain is resetting which can manifest in altered consciousness, such as confusion delirium, fatigue, and language dysfunction. **Doc. 103 at 10**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1261 (10th Cir. 2022) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but once the movant has done so, the burden shifts to the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022). The movant may satisfy its initial burden by producing affirmative evidence negating an essential element of the non-movant's claim. *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). In opposing summary judgment, the non-movant cannot rest on mere allegations but "must bring forward specific facts showing a genuine issue for trial." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (Holmes, J.) (internal quotation marks omitted). "The summary judgment standard requires [the Court] to construe the facts in the light most favorable to the non-movant and to draw all reasonable inferences in its favor." *Est. of Beauford*, 35 F.4th at 1261 (citing *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021)). The Court's function at this stage "is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. Further, the Court need not accept allegations contradicted by objective evidence. *Est. of Beauford*, 35 F.4th at 1261 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## QUALIFIED IMMUNITY STANDARD

Qualified immunity changes the summary judgment analysis. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

By asserting qualified immunity at the summary judgment stage, "the burden shifts to the plaintiff, who must demonstrate on the facts alleged that (1) the defendant's actions violated his or her constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged misconduct." *Est. of Beauford*, 35 F.4th at 1261 (citing *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)).

Defendants do not bear the "traditional burden of the movant for summary judgment" unless the Plaintiff is able to satisfy this two-part test. *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018) (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000)). This is a "demanding standard." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). The Tenth Circuit has explained:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. The dispositive question is whether the violative nature of the particular conduct is clearly established.

*Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quotations and citations omitted). Typically, a plaintiff may satisfy this demanding standard by "identifying an on-point Supreme Court or published Tenth Circuit decision that establishes the unlawfulness of the defendant's conduct." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quoting *Quinn v. Young*, 780

F.3d 998, 1005 (10th Cir. 2015)). Alternatively, a plaintiff can also satisfy the clearly established standard by demonstrating that "the clearly established weight of the authority from other courts must have found the law to be as the plaintiff maintains." *Quinn*, 780 F.3d at 1005 (quoting *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010)).

In short, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## DISCUSSION

In her Complaint, *see* **Doc. 39**, Plaintiff brings several state law claims for violations of the New Mexico Tort Claims Act ("NMTCA") and the New Mexico Civil Rights Act ("NMCRA"). She also brings various constitutional claims under 42 U.S.C. § 1983.

Defendants filed five Motions for Partial Summary Judgment. *See* **Docs. 75, 77, 78, 79, 80**. Collectively, these motions seek summary judgment on all eleven of Plaintiff Peña-Lee's claims. The Court now evaluates each Motion in turn.

## I. Defendants' Motion for Partial Summary Judgment on Plaintiff's Unreasonable Seizure Claims:

In this first Motion (**Doc. 75**), Defendants Andrew Lazarin, Christopher Baker, Alexis Rodriguez, Christian Vitale, and the City of Las Cruces—hereinafter referred to as Defendants— seek summary judgment on Plaintiff's unreasonable seizure claims: *viz.* Counts I and VII.

In Count I, Plaintiff alleges "Defendants Lazarin, Baker, Rodriguez, and [sic] violated Plaintiff's Article II, Section 10 right to be free from unreasonable seizures by arresting her despite lacking probable cause to believe she was impaired by drugs and ignoring her need for medical attention." **Doc. 39 at 14**. In Count VII, Plaintiff alleges "Defendants Lazarin and Baker violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures by arresting her despite

lacking probable cause to believe she was impaired by drugs and ignoring her need for medical attention." *Id.* **at 18**.

Based on Plaintiff Peña-Lee's Complaint (**Doc. 39**) and her arguments in opposition (**Doc. 103**) to Defendants' Motion for Summary Judgment (**Doc. 75**), her unreasonable seizure claims rest entirely on the alleged lack of probable cause at the time of her arrest. As a result, the Court assesses Plaintiff's unreasonable seizure claims by ascertaining whether probable cause existed **at the time of her arrest**.

### A. Plaintiff's § 1983 Unreasonable Seizure Claims:

Defendants say summary judgment is appropriate on Plaintiff's § 1983 unreasonable seizure claim because they're entitled to qualified immunity. **Doc. 75 at 11**. The Court agrees.

Beginning with the first prong, Plaintiff Peña-Lee failed to establish that Defendants Lazarin and Baker violated her rights under the Fourth Amendment when they arrested her. As stated in her Response, "Plaintiff does not contest that it was lawful for Defendant Lazarin and Vitale to stop her vehicle." **Doc. 103 at 41**. "Nor does Plaintiff allege that Defendant Lazarin should have immediately known Plaintiff had just suffered from a seizure." *Id.* Even so, Plaintiff alleges that Defendants violated her state and federal constitutional rights when they used her indicators of her disability as indicators of criminality to create a basis for arrest. *Id.* Essentially, Plaintiff asserts that the officers violated her rights when they arrested her without probable cause based on her disability.

"A warrantless arrest violates the Fourth Amendment unless it was supported by probable cause." *A.M. v. Holmes*, 830 F.3d 1123, 1138 (10th Cir. 2016) (citing *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008)); *see also Romero v. Story*, 672 F.3d 880, 889

(10th Cir. 2012) ("In the context of an unlawful arrest . . . the law was and is unambiguous: a government official must have probable cause to arrest an individual.").

Under federal law, "probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon*, 535 F.3d at 1216 (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

New Mexico courts apply the same definition of probable cause as federal courts. *State v. Cohen*, 1985-NMSC-111, ¶ 36, 103 N.M. 558, 711 P.2d 3 (N.M. 1985) ("Probable cause exists when the facts and circumstances within the knowledge of the officers, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed.").

When determining whether officers had probable cause to arrest an individual, courts "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "Neither the officer's subjective beliefs nor information gleaned post-hoc bear on this inquiry." *Manzanares v. Higdon*, 575 F.3d 1135, 1144 (10th Cir. 2009). Ultimately, "[a]ll that matters is whether [the officer] possessed knowledge of evidence that would provide probable cause to arrest on *some* ground." *Apodaca v. City of Albuquerque,* 443 F.3d 1286, 1289 (10th Cir. 2006). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).

Under NMSA 1978 § 66-8-102 (A) & (B), it is unlawful for a person who is under the influence of intoxicating liquor or any drug to a degree that renders the person incapable of safely driving a vehicle, to drive a vehicle. The statute's standard is "impaired to the slightest degree."

*See State v. Neal*, 2008-NMCA-008, ¶ 21, 143 N.M. 341, 176 P.3d 330 (N.M. Ct. App. 2008) (applying the slightest-degree standard).

Both state and federal courts hold that factors such as slurred speech, glossy eyes, impaired balance, memory lapses, and poor performance on SFST are signs of impairment that support probable cause to arrest a defendant for driving under the influence ("DUI")/driving while intoxicated ("DWI"). *See, e.g.*, *United States v. Chavez*, 660 F.3d 1215, 1224 (10th Cir. 2011) (explaining poor performance on three field sobriety tests contributed to probable cause to arrest driver for DUI); *State v. Granillo-Macias*, 2008-NMCA-021, ¶ 12, 143 N.M. 455, 176 P.3d 1187 (N.M. Ct. App. 2007) (holding smell of alcohol on defendant, defendant's unsteady balance near vehicle, and defendant's performance during SFST established probable cause to arrest him for driving while intoxicated).

\* \* \*

In this case, the undisputed material facts show that officers observed several signs of impairment in Plaintiff Peña-Lee before arresting her—including slurred speech, droopy eyes, impaired balance, memory lapses, and poor performance on SFST. Additionally, Plaintiff displayed other suspicious behavior, such as driving away when officers attempted to stop her. Reports from eyewitnesses indicated Plaintiff's daughter was running around the parking lot while Plaintiff was passed out and drooling in her vehicle before officers arrived on-scene. Given these facts, a reasonable officer in similar circumstances would have concluded—as Defendants Lazarin and Baker did—that Plaintiff drove while under the influence of drugs or alcohol, thereby establishing probable cause to arrest her.

Moreover, the Court rejects Plaintiff's argument that, after notifying Defendants Lazarin and Baker of her seizure disorder, they were obligated to further investigate potential exculpatory

17

evidence—specifically, evidence that her symptoms were caused by a seizure rather than drugs or alcohol. Plaintiff relies on *Cortez v. McCauley*, to support this assertion. 478 F.3d 1108, 1121 (10th Cir. 2007) (en banc). In *Cortez*, the Tenth Circuit held that a nurse's double-hearsay statement—based on a two-year-old child's phone call—was insufficient to establish probable cause. Under those circumstances, the Tenth Circuit concluded that officers were required to conduct additional investigation before making an arrest. *Id.* at 1119.

While *Cortez* certainly confirms further investigation may be required in certain circumstances before officers make an arrest, it does not establish further investigation was required before officers made an arrest in this case. In fact, the Tenth Circuit in *Cortez* emphasized that once probable cause exists, officers are not obligated to seek out exculpatory evidence before proceeding with an arrest. *Id.* at 1121 n.18 (citing *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979)). Thus, Plaintiff's reliance on *Cortez* is unpersuasive because Defendants Lazarin and Baker had probable cause once Plaintiff performed poorly on her SFST despite her assertion that she suffered from a seizure disorder. *See, e.g., Rehms v. Post Falls Police Dep't*, 2024 U.S. App. LEXIS 32636, at *3 (9th Cir. Dec. 23, 2024) (unpublished) ("[D]ifficulty performing . . . routine field sobriety tests" was not overcome by Plaintiff's assertion "that her conditions were caused by a [previous] TBI"); *Krueger v. Bell*, No. 04-cv-142, 2005 U.S. Dist. LEXIS 27877, at *12 (M.D. Fla. Nov. 2, 2005) (even where plaintiff told arresting officer that she was an epileptic, officer had probable cause to arrest plaintiff for DUI without investigating epilepsy claim as her physical condition was also consistent with intoxication); *Pecena v. Martin*, No. 11-cv-2325, 2012 U.S. Dist. LEXIS 119793, at *11 (N.D. Tex. Aug. 23, 2012) (same but for self-reported Ambien); *Jackson v. Inhabitants of Town of Sanford*, No. 94-cv-12, 1994 U.S. Dist. LEXIS 15367, at *6 (D. Me. Sept. 23, 1994) (finding it objectively reasonable for officers to arrest defendant for DUI

without a warrant, despite defendant's claim of a brain aneurysm causing physical disabilities because the officers observed that the defendant was unsteady, had slurred speech, appeared confused, and performed poorly on field sobriety tests).

To elaborate, it was not objectively unreasonable for officers to continue to believe they had probable cause to arrest Plaintiff after she disclosed that she had a seizure disorder because when first asked if she suffered a medical emergency Plaintiff said she had not, Plaintiff was medically cleared by the fire department after officers reported to them that Plaintiff had a seizure disorder, Plaintiff exhibited numerous signs of impairment, and had no documentation, such as a classification on her license that she suffered from seizures. "But probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 583 U.S. at 61; *see Munday v. Johnson*, 257 F. App'x 126, 134 (10th Cir. 2007) (unpublished) (citing *United States v. Patane*, 304 F.3d 1013, 1018 (10th Cir. 2002), *rev'd on other grounds*, 542 U.S. 630 (2004)); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (noting an innocent explanation does not defeat probable cause); *Thompson v. Olson,* 798 F.2d 552, 557 (1st Cir. 1986) (explaining that police officers not required to give significant weight to suspect's self-exonerating claims in determining whether probable cause existed).

Turning to the clearly established prong, Plaintiff cannot establish that Defendants Lazarin and Baker violated a clearly established right. The Tenth Circuit applies the clearly-established prong by asking if there was "'arguable probable cause' for an arrest—if there was, a defendant is entitled to qualified immunity." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012) (quoting *Cortez*, 478 F.3d at 1121). Arguable probable cause "exists where a reasonable police officer in the same circumstances and with the same knowledge possessing the same knowledge in question could have reasonably believed that probable cause existed in light of well-established law.'"

19

*Cronick v. Pryor*, 99 F.4th 1262, 1270 (10th Cir. 2024) (quoting *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014)). At the very least, considering the cases and facts above, Defendants Lazarin and Baker had arguable probable cause to arrest Plaintiff for driving under the influence.

Consequently, Plaintiff Peña-Lee failed to establish both prongs of the qualified immunity analysis as to her arrest. Defendants are therefore entitled to qualified immunity as to Plaintiff's § 1983 unreasonable seizure claims.

### B. Plaintiff's Article II, Section 10 Unreasonable Seizure Claims:

Plaintiff Peña-Lee says her arrest was unlawful—and, therefore, "prohibited by . . . Article II Section 10"—because "Defendants ha[d] insufficient probable cause." **Doc. 103 at 41**.

But reasonable suspicion existed at the inception of the seizure. *See State v. Garcia*, 2009-NMSC-046, ¶ 43, 147 N.M. 134, 217 P.3d 1032 (N.M. 2009). The officers responded to a 911 call for suspicious activity. They were told Plaintiff was unconscious in her vehicle. And they were told Plaintiff's daughter was running around outside the vehicle unattended. *See Navarette v. California*, 572 U.S. 393, 401–02 (2014) (explaining a 911 caller, plus more, can form reasonable suspicion); *see also State v. Contreras*, 2003-NMCA-129, 134 N.M. 503, 79 P.3d 1111 (N.M. Ct. App. 2003) (holding that erratic driving observed and reported by a reliable concerned motorist in a 911 call provided the officer with reasonable suspicion to stop a well-identified vehicle for possible drunk driving).

Plus, there was more than reasonable suspicion here. The undisputed material facts establish the officers had probable cause to arrest Plaintiff for driving under the influence. As such, Defendants are also entitled to summary judgment on Plaintiff's Article II, Section 10 state law unreasonable seizure claims. *See infra* ¶ VI.

* * * * *

In sum, Defendants Motion for Summary Judgment on Plaintiff's unreasonable seizure claims (**Doc. 75**) is **GRANTED**.

## II. Defendants' Motion for Partial Summary Judgment on Plaintiff's False Arrest and Battery Claims:

In their second Motion (**Doc. 77**), Defendants ask the Court to grant summary judgment on Plaintiff's false arrest and battery claims—*i.e.*, Counts III and IV. In Count III, Plaintiff alleges Defendants Lazarin and Baker knowingly or recklessly arrested Plaintiff without legal justification to do so. **Doc. 39 at 15**. In Count IV, Plaintiff alleges Defendants Lazarin and Baker intentionally, and without legal justification or consent applied force to Plaintiff's person." *Id.* **at 16**.

### A. False Arrest:

In New Mexico, "[f]alse arrest or unlawful detention occurs when the 'facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate." *Gose v. Bd. of Cnty. Comm'rs of the Cnty. of McKinley*, 727 F. Supp. 2d 1256, 1260 (D.N.M 2010) (citing *Romero v. Sanchez*, 1995-NMSC-028, ¶ 13, 895 P.2d 212 (N.M. 1995) (citations omitted)). However, "[w]hen probable cause is present, a person cannot be held liable for false arrest or false imprisonment since probable cause provides the necessary authority to carry out the arrest." *Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 12, 350 P.3d 1234 (N.M. Ct. App. 2015) (quoting *Santillo v. N.M. Dep't of Pub. Safety,* 2007-NMCA-159, ¶ 12, 143 N.M. 84, 173 P.3d 6 (N.M. Ct. App. 2007)). "Probable cause to arrest for a single charge will suffice to immunize Defendants from Plaintiff's wrongful arrest claims." *Benavidez*, 2015-NMCA-065, at ¶ 12 (citing *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 682 (7th Cir. 2007)).

The Court concludes that probable cause existed at the time of Plaintiff's arrest, as discussed above. And probable cause immunizes Defendants from Plaintiff's false arrest claim. Thus, summary judgment is warranted.

**B. Battery:**

Under New Mexico law, an individual commits battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." *State v. Ortega*, 1992-NMCA-003, ¶ 12, 113 N.M. 437, 827 P.2d 152 (N.M. Ct. App. 1992) (quoting Restatement (Second) of Torts § 18 (1965)).[3] Offensive contact includes "an intent to touch in a way that the defendant understands is not consented to," or an "actual intent to harm. *Peña v. Greffet*, 108 F. Supp. 3d 1030, 1048 (D.N.M. 2015).

The New Mexico Supreme Court, however, recognizes a privilege afforded to law enforcement officers who use reasonable force. "Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace." *State v. Ellis*, 2008-NMSC-032, ¶ 23, 144 N.M. 253, 186 P.3d 245 (N.M. 2008) (citation omitted). When acting in good faith, the courts will afford them the utmost protection." *Mead v. O'Connor*, 1959-NMSC-077, ¶ 4, 66 N.M. 170, 344 P.2d 478 (N.M. 1959); *see also Jonas v. Bd. of Comm'rs of Luna Cnty.*, 699 F. Supp. 2d 1284, 1297 (D.N.M. 2010) (reasoning that law enforcement officers are not liable for battery if "they acted in good faith and did not use more force than reasonably

---

[3] Significantly, there is no New Mexico Uniform Jury Instruction as to battery. When addressed with creating a Uniform Jury Instruction on assault and battery, the Committee concluded that "there was insufficient New Mexico Law on assault and battery to guide the committee on this subject." *Peña*, 108 F. Supp. 3d at 1057–58 (quoting NMRA Civ. UJI § 13-1624, comm. comment.); *see also Giever v. City of Las Cruces City Comm'n & Las Cruces Police Officers*, No. 08-cv-155, 2010 U.S. Dist. LEXIS 163479, at *33–34 (D.N.M. Jan. 12, 2010) (same).

necessary to preserve the peace or effect an arrest"); *Reynaga v. Cnty. of Bernalillo*, 64 F.3d 670, at \*4 [published in full-text format at 1995 U.S. App. LEXIS 24230] (10th Cir. 1995) (recognizing a general rule that law enforcement officers are "not civilly liable for using such force as may reasonably be necessary in the enforcement of law and the preservation of order").

When assessing whether an officer's use of force was reasonably necessary, New Mexico courts apply an objective reasonableness test—similar to the excessive force test used in *Graham v. Connor*, 490 U.S. 386, 397 (1989). *See State v. Lymon*, 2021-NMSC-021, ¶ 32, 488 P.3d 610 (N.M. 2021); *Ellis*, 2008-NMSC-032, at ¶¶ 25–28; *see also Fancher v. Barrientos*, No. 11-cv-118, 2012 U.S. Dist. LEXIS 191907, at \*24 (D.N.M. June 13, 2012) (emphasizing New Mexico applies an objective reasonableness test to battery claims and addressing NMTCA claims in the same manner as Section 1983 excessive force claims)*; Jonas*, 699 F. Supp. 2d at 1297 (explaining New Mexico courts apply the *Graham* test to battery claims).

In *Graham*, the Supreme Court of the United States stated, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." 490 U.S. at 397. The *Graham* court also explained how "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.*

Here, Plaintiff alleges Defendants Lazarin and Baker—two law enforcement officers—are liable for battery.

The record contains no evidence that Defendants Lazarin and Baker used any force on Plaintiff that was not in good faith and reasonably necessary to effectuate a lawful arrest. As discussed above, Defendants had probable cause to arrest Plaintiff for driving under the influence.

After arresting Plaintiff, Defendants handcuffed her and transported her to the LCPD station. There was no struggle between Plaintiff and Defendants Lazarin and Baker during or after the arrest. Plaintiff does not allege that the handcuffs were too tight or caused pain, nor does she identify any specific use of force that was unreasonable. Thus, any force used by Defendants Lazarin and Baker was applied in good faith and was reasonably necessary to effectuate a lawful arrest. Consequently, Defendants are entitled to summary judgment on Plaintiff Peña-Lee's battery claim.

* * * * *

For these reasons, the Court **GRANTS** Defendants' Motion for Partial Summary Judgment on Plaintiff's False Arrest and Battery claims (**Doc. 77**).

### III. Defendants' Motion for Partial Summary Judgment on Plaintiff's Malicious Prosecution and Malicious Abuse of Process Claims:

In this Motion (**Doc. 78**), Defendants ask the Court to grant summary judgment on Plaintiff's malicious prosecution and malicious abuse of process claims in Counts II, VI, VIII.[4]

In Counts II and VIII, Plaintiff alleges Defendant Lazarin, as a law enforcement officer, breached his duty to refrain from initiating prosecution against citizens without probable cause when he charged Plaintiff with a crime he knew or should have known he did not have probable cause to believe she had committed. **Doc. 39 at 19**. Plaintiff further alleges, under Count II, that Defendant Lazarin acted willfully, maliciously recklessly when prosecuting Plaintiff because he knew or showed reckless disregard to the fact that he did not have probable cause to believe Plaintiff committed the crime for which she was charged. *Id.* **at 15**.

In Count VI, Plaintiff alleges that Defendant Lazarin, "without legal cause or justification, initiated, encouraged, or participated in the brining [sic] of criminal charges against Plaintiff," and

---

[4] The Complaint duplicates Count VIII. *See* **Doc. 39 at 18–19**. The first Count VIII is titled "NEGLIGENT SUPERVISION and/or TRAINING," while the second Count VIII is for "MALICIOUS PROSECUTION."

that "his primary purpose in filing charges against Plaintiff was to accomplish illegitimate ends." *Id.* **at 17**. The Court addresses whether summary judgment is appropriate as to each claim below.

### A. Malicious Prosecution:

Initially, the Court acknowledges that false imprisonment and malicious prosecution claims are closely related. Fortunately, the Tenth Circuit has elaborated on their differences. In *Myers v. Koopman*, the Tenth Circuit explained that "like rain and snow, the claims emanate from the same source but under different conditions." 738 F.3d 1190, 1194 (10th Cir. 2013). The *Myers* Court further explained that "unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims, while unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious prosecution claims." *Id.*

For example, a plaintiff arrested with a warrant who believes officers lied to obtain it may pursue a malicious prosecution claim. In contrast, a plaintiff arrested without a warrant who believes the arrest lacked probable cause may bring a false arrest claim.

Because officers arrested and detained Plaintiff without a warrant, she cannot assert a malicious prosecution claim for her arrest. Instead, her malicious prosecution claim must be based on her continued prosecution—which was initiated through legal process by Defendant Lazarin's filing of a criminal complaint.

To establish a Fourth Amendment malicious prosecution claim under § 1983, a plaintiff must show that: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Margheim v. Buljko*, 855 F.3d 1077, 1082 (10th Cir. 2017)

(citation omitted).[5] The Supreme Court listed the elements of malicious prosecution as: "(1) the suit or proceeding was instituted without any probable cause; (2) the motive in instituting" the suit was malicious, which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (3) the prosecution terminated in the acquittal or discharge of the accused." *Thompson v. Clark*, 596 U.S. 36, 44 (2022) (cleaned up). No matter which test is applied, "the gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause." *Id.* at 43.

\* \* \*

In *Becker v. Kroll*, the Tenth Circuit held that a Fourth Amendment seizure is necessary to support a § 1983 malicious prosecution claim based on the initiation of criminal proceedings that are dismissed before trial. 494 F.3d 904, 914 & 918 (10th Cir. 2007). The *Kroll* Court specified that a Fourth Amendment seizure requires physical control, specifically arrest or imprisonment by the state. *Id.* at 914–15. The *Kroll* Court also refused to extend liability in cases without traditional seizures, reasoning that to do so "would expand the notion of seizure beyond recognition and . . . every charging decision would support a § 1983 malicious prosecution-type claim no matter the context. *Id.* at 915.

Applying the *Kroll* opinion to the instant case, Plaintiff cannot establish a § 1983 malicious prosecution claim because she was neither arrested nor imprisoned after Defendant Lazarin filed the criminal complaint. The undisputed facts establish that Plaintiff was released from custody on

---

[5] A few years ago, the Supreme Court abrogated the Tenth Circuit's "favorable termination" jurisprudence. *See Thompson*, 596 U.S. at 41 (abrogating *Cordova v. Albuquerque*, 816 F.3d 645, 649 (10th Cir. 2016)). The Court held that "a Fourth Amendment claim . . . for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence." *Id.* at 48.

   Here, Defendants (correctly) argue the "common law elements of malicious prosecution are the starting point for the Court's analysis. **Doc. 78 at 5–6**. Because Defendants do not contend that "favorable termination" is an element of Plaintiff Peña-Lee's claim, this Court need not consider *Thompson*'s impact on this case.

October 3, 2021. Although Defendant Lazarin filed a criminal complaint against her the next day, she was never arrested or imprisoned again.

Since Plaintiff cannot establish that she was subjected to a Fourth Amendment seizure following Defendant Lazarin's filing of the criminal complaint, Defendants are entitled to summary judgment on Plaintiff's § 1983 malicious prosecution claim. *See Crothers v. Carr*, 2025 U.S. App. LEXIS 8978, at *32–34 (10th Cir. Apr. 16, 2025) (unpublished) (repeating the *Becker* seizure requirement even after *Thompson*).

### B. Malicious Abuse of Process:

In *Durham v. Guest*, the New Mexico Supreme Court acknowledged that under New Mexico law, the torts of malicious prosecution and abuse of process are combined into a single cause of action identified as "malicious abuse of process." 2009-NMSC-007, ¶ 18, 145 N.M. 694, 204 P.3d 19 (N.M. 2009). The *Durham* Court also set forth the following elements for a malicious abuse of process claim: (1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages." *Id.* (quoting *DeVaney v. Thriftway Mktg. Corp.,* 1998-NMSC-001, ¶ 17, 124 N.M. 512, 953 P.2d 277 (N.M. 1997), *abrogated on other grounds by Fleetwood Retail Corp. of N.M. v. LeDoux,* 2007-NMSC-047, ¶¶ 19–21, 142 N.M. 150, 164 P.3d 31 (N.M. 2007)).

To establish improper use of process in a judicial proceeding, a plaintiff can show that the defendant filed a complaint without probable cause. *Benavidez*, 2015-NMCA-065, at ¶ 20. In the context of malicious abuse of process, "probable cause" is defined as "a reasonable belief, founded

on known facts, established after a reasonable pre-filing investigation, that a claim can be established to the satisfaction of a court or jury." *Id.* (citation omitted).

But the absence of probable cause must be manifest—that is, very clearly proven or very palpable. *Fleetwood Retail Corp*, 2007-NMSC-047, at ¶ 13; *DeVaney*, 1998-NMSC-001, at ¶ 22. This heightened standard exists because malicious abuse of process is a disfavored tort due to its potential chilling effect on prosecution of crimes and the right of access to the courts. *DeVaney*, 1998-NMSC-001, at ¶ 19. New Mexico case law cautions courts to undertake the probable cause analysis "in a manner that will likely have the least chilling effect on a litigant's access to the courts." *O'Brien v. Behles*, 2020-NMCA-032, ¶ 60, 464 P.3d 1097 (N.M. Ct. App. 2020) (citation omitted).

To determine whether Defendant Lazarin had probable cause to file the criminal complaint against Plaintiff, the Court must consider the facts known to him at the time he filed the criminal complaint. This analysis is distinct from the Court's review of Plaintiff's unreasonable seizure and false arrest claims, which focused solely on whether probable cause existed at the time of Plaintiff's initial arrest. While Officer Lazarin had probable cause to arrest Plaintiff as set forth above, the following facts emerged between Plaintiff's arrest and Officer Lazarin filing the criminal complaint: Plaintiff blew a 0.00 on a breathalyzer test, Plaintiff's husband reported Plaintiff had a seizure disorder, and Plaintiff had what appeared to be a seizure in front of officers.

Even considering these post-arrest developments, the Court concludes that Officer Lazarin had probable cause to file the criminal complaint against Plaintiff. To undermine the initial probable cause supporting the arrest, evidence would be needed to show that Plaintiff's observed signs of impairment were attributable to a seizure rather than alcohol or drugs. While the breathalyzer results ruled out alcohol, they did not eliminate the possibility of drug impairment—

and a seizure is not inherently inconsistent with drug use.[6] Additionally, paramedics confirmed that Plaintiff's vitals were stable, and Plaintiff's refusal to consent to a blood test further supported a reasonable belief in drug impairment. Thus, even after witnessing Plaintiff suffer an apparent seizure, probable cause remained at the time Officer Lazarin filed the complaint. After all, an objectively reasonable officer is not expected to don a white coat and make complex medical diagnoses. *Cf.* **Doc. 79 at 10**.

Even assuming the post-arrest developments undermined probable cause, any deficiency was not manifest. At a minimum, the existence of probable cause was a close call. Therefore, Plaintiff cannot establish that Officer Lazarin filed the criminal complaint without probable cause or that any lack of probable cause was manifest. Consequently, Defendants are entitled to summary judgment on Plaintiff's malicious abuse of process claims.

* * * * *

The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's Malicious Prosecution and Malicious Abuse of Process claims (**Doc. 78**).

## IV. Defendants' Motion for Partial Summary Judgment on Plaintiff's Americans with Disabilities Claims:

In the next Motion (**Doc. 79**), Defendants seek summary judgment on Plaintiff's claims under the Americans with Disabilities Act—*i.e.*, Counts IX and X.

In Count IX, Plaintiff alleges: (1) she is a qualified individual, and (2) that Defendants Lazarin and Baker through the course of their employment "acted in such a way to discriminate against Plaintiff as a result of her disability." **Doc. 39 at 20**. Plaintiff further alleges Defendants Lazarin, Baker, and Vitale ignored Plaintiff's disability and proceeded to investigate her for a

---

[6] *See* **Doc. 103-14 at 3** (confirming opioid-related disorders can present as seizures, and seizures can present as opioid-related disorders).

crime where the only evidence was the symptoms of her disability and failed to reasonably accommodate Plaintiff's disability. *Id.* In Count X, Plaintiff alleges that the City of Las Cruces is responsible for training its law enforcement officers regarding compliance with the Americans with Disabilities Act and failed to do so. *Id.*

\* \* \*

Title II of the ADA looks to protect individuals with a disability from discrimination by requiring public services provided by state and local public services to accommodate qualified individuals so that they can access and/or receive the benefits of public services provided by the governmental entity. *See* Title II, 42 U.S.C. §§ 12131–12165.

A number of cases suggest the ADA is inapplicable to arrests because an arrest is not the type of service, program, or activity from which a disabled person could be excluded or otherwise denied the benefit. *See Armstrong v. Wilson*, 124 F.3d 1019 (9th Cir. 1997); *Rosen v. Montgomery Cnty., Md.*, 121 F.3d 154, 157 (4th Cir. 1997) (where a deaf person was arrested for drunk driving, court held that "calling a drunk driving arrest a 'program or activity' of the County, the 'essential eligibility requirements' of which (in this case) are weaving in traffic and being intoxicated, strikes us as a stretch of the statutory language and of the underlying legislative intent."); *Hainze v. Richards,* 207 F.3d 795 (5th Cir. 2000); *cf. Tucker v. Tennessee*, 539 F.3d 526, 535 (6th Cir. 2008).

In *Gohier v. Enright*, however, the Tenth Circuit recognized there is no broad rule "categorically excluding arrests from the scope of Title II." 186 F.3d 1216, 1221 (10th Cir. 1999). The Tenth Circuit further discussed two potentially viable theories involving police conduct recognized by other federal courts: the wrongful-arrest theory and the reasonable accommodation during arrest theory. *Id.* Under the wrongful arrest theory, officers may be liable for arresting an individual after misperceiving the effects of the individual's disability as illegal conduct. *Id.* Under

the reasonable accommodation during arrest theory, law enforcement officers may be liable if they fail to reasonably accommodate a person with a disability during the course of an investigation or arrest for a crime unrelated to the disability. *Id.* at 1222; *Gorman v. Bartch,* 152 F.3d 907, 912–13 (8th Cir. 1998). The *Gohier* Court recognized that other federal courts had allowed these claims but noted that the Tenth Circuit had yet to decide whether to adopt one or both theories. *Id.* at 1221.

There is some support for the viability of these theories in the legislative history[7] of the ADA as well:

> In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid of seizures. Such discriminatory treatment based on disability can be avoided by proper training.

H.R. Rep. No. 101-485, pt. 3, at 50 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 473.

Since the Tenth Circuit has not rejected either the wrongful-arrest theory and the reasonable accommodation during arrest theory and legislative history appears to support their validity, the Court will assume both claims are viable. Because Plaintiff does not clarify whether Count IX

---

[7] Usually, the Court would afford little (if any) weight to the legislative history. It's inherently fallible. In fact, some judges have described legislative history as "entering a crowded cocktail party and looking . . . for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in judgment). As it stands, the "weight" afforded to legislative history is up for debate. *See, e.g., Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006) ("Whatever weight this legislative history would merit in another context, it is not sufficient here."); *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005) (noting that "legislative history" is not authoritative and is "vulnerable . . . murky, ambiguous, and contradictory."); *Oklahoma v. U.S. Health & Hum. Servs.*, 107 F.4th 1209, 1236 (10th Cir. 2024) (Federico, J., dissenting) (calling legislative history "a mixed bag"); *Leversen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1238 (10th Cir. 2016) (Holmes, J., dissenting) (questioning the value of legislative history).

But this passage from the House Report was cited by the Tenth Circuit (albeit, in dicta). *See Gohier*, 186 F.3d at 1221. And other courts have cited this report as well. *See, e.g., Everson v. Leis*, 412 F. App'x 771, 780 n.3 (6th Cir. 2011) (unpublished); *Brown v. Belt*, No. 15-cv-11549, 2017 U.S. Dist. LEXIS 171049, at *9 (S.D. W. Va. Oct. 13, 2017); *cf. Haberle v. Troxell*, 885 F.3d 171, 180 n.10 (3d Cir. 2018). All that to say, this pre-enactment legislative history provides some support for Plaintiff's claims here.

asserts a wrongful arrest or a failure to accommodate during an arrest, the Court will first evaluate

both theories before addressing Plaintiff's negligent training claim under the ADA.

### A. Wrongful Arrest Theory:[8]

To establish a wrongful arrest claim under the ADA, a plaintiff must show: (1) he or she

was disabled, (2) that defendants knew or should have known that he/she was disabled, and (3)

that defendants arrested him or her because of legal conduct related to his or her disability. *Lewis

v. Truitt*, 960 F. Supp. 175, 178 (S.D. Ind. 1997); *Trujillo v. Rio Arriba Cnty.*, No. 15-cv-901, 2016

U.S. Dist. LEXIS 96797, at *29 (D.N.M. June 15, 2016); *Gohier*, 186 F.3d at 1220 (citing *Barber

v. Guay*, 910 F. Supp. 790, 802 (D. Me. 1995)).

*First*, the Court addresses whether Plaintiff is disabled for purposes of the ADA. To show

an actual disability under § 12102(1)(A), a plaintiff must: "(1) have a recognized impairment, (2)

identify one or more appropriate major life activities, and (3) show the impairment substantially

limits one or more of those activities." *Callahan v. Commc'n Graphics*, No. 13-cv-816, 2015 U.S.

Dist. LEXIS 116871, *13–14 (N.D. Okla. Sept. 2, 2015) (quoting *Felkins v. City of Lakewood*,

774 F.3d 647, 650 (10th Cir. 2014)). "The plaintiff 'must articulate with precision the impairment

alleged and the major life activity affected by that impairment,' . . . and the court is to analyze only

those activities identified by the plaintiff." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117,

1129 (10th Cir. 2003) (internal citations omitted). Examples of major life activities are "caring for

oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

---

[8] Again, this Court notes that the Tenth Circuit has not expressly decided the viability of a wrongful-arrest theory under the ADA. *See Clark v. Colbert*, 895 F.3d 1258, 1265 (10th Cir. 2018) ("[W]e have never squarely held the ADA applies to arrests."). Even so, the Tenth Circuit has identified wrongful arrest as a potential theory of a Title II claim. *See Gohier*, 186 F.3d at 1220–21. Thus, "[h]aving been presented with no controlling case law to the contrary, the Court will assume . . . that Title II of the ADA applies to arrests." *A.V. v. Douglas Cnty. Sch. Dist. RE-1*, 586 F. Supp. 3d 1053, 1063 (D. Colo. 2022).

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A).

Defendants do not dispute that Plaintiff's seizure disorder qualifies as an impairment under the ADA. Instead, they argue that summary judgment is warranted because Plaintiff has not precisely identified a major life activity affected by her impairment or provided evidence demonstrating how her seizure disorder substantially limits that activity. **Doc. 79 at 6–9**. The Court disagrees.

Plaintiff identified major life activities affected by her seizure-disorder. In her response, Plaintiff explained how suffering from a seizure limits her brain function, and she becomes confused and bewildered and often has no memory of seizure and the time after the seizure. **Doc. 103 at 37**. Plaintiff also explains how her seizures limit her ability to interact and understand what is going on around her. *Id.* Given these statements, Plaintiff identified that her memory, ability to think, concentrate, and ability to communicate are major life activities affected by her impairment.

A reasonable jury could also find that Plaintiff's impairment substantially limits major life activities. An episodic impairment, such as a seizure disorder, qualifies as a disability if it would significantly restrict a major life activity when *active*. *See* § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."). When Plaintiff experiences seizures, evidence suggests she loses consciousness and memory of the seizure and the surrounding time. As a result, a jury could conclude that, when active, Plaintiff's impairment substantially limits her ability to remember, think, and concentrate.

*Second*, the Court addresses whether the officers knew Plaintiff was disabled. The Court finds that, although the officers did not know and should not have known of Plaintiff's disability at the time of her initial arrest, they became aware or should have become aware during the arrest.

This conclusion is supported by the officers observing Plaintiff have what appeared to be a seizure while in their custody. Given this evidence, a reasonable jury could conclude that the officers knew or should have known of Plaintiff's disability during the arrest, especially after witnessing her have what appeared to be a seizure.

*Third*, the Court finds Plaintiff was arrested by reason of conduct stemming from her disability. Viewing the evidence in Plaintiff's favor,[9] her symptoms were the result of a seizure rather than drug impairment. Under this assumption, the Court concludes that the officers misinterpreted the effects of her disability—including her confusion, poor balance, and slurred speech—as evidence of illegal conduct.

\* \* \*

A few cases are particularly instructive. The first is *Jones v. Española Mun. Sch. Dist.*, No. 13-cv-741, 2014 U.S. Dist. LEXIS 203658, at \*11 (D.N.M. July 29, 2014). In *Jones*, U.S. District Judge Robert Brack reasoned that: "For the wrongful arrest theory to apply, the conduct that is mistaken for criminal activity must actually be lawful. Thus, the theory applied to a case where a stroke victim was arrested for driving under the influence, even though he had actually been driving sober . . . and to a case where a deaf man was charged with resisting arrest, when in fact he simply could not hear the officers' orders." Judge Brack's sound reasoning and examples in the *Jones* case demonstrates why Plaintiff Peña-Lee's claim survives summary judgment here.

Equally instructive are the Tenth Circuit's decisions in *J.H. v. Bernalillo Cnty.*, 806 F.3d 1255, 1260 (10th Cir. 2015) and *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1313 (10th Cir. 2021). The *J.H.* Court noted that a Plaintiff's "disability might cause the police to incorrectly suspect" an

---

[9] At summary judgment, the Court views the facts "in the light most favorable to the nonmovant" and draws "all reasonable inferences in the nonmovant's favor." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015); *see generally Tolan v. Cotton*, 572 U.S. 650 (2014) (same).

individual of committing a crime "based on" or "by reason of" a disability. *J.H.*, 806 F.3d at 1260. Ultimately, though, the Court declined to decide that issue. *Id.* Nevertheless, the *Crane* Court resolved the ADA pleading standard—explaining that a Plaintiff need only allege the disability is a "reason" for the discrimination rather that "its sole cause." *Crane*, 15 F.4th at 1313.

Because a reasonable jury could conclude from the evidence that Plaintiff is disabled, that the officers knew or should have known of her disability during the arrest, and that they misinterpreted the effects of her disability as signs of illegal conduct, Defendants are not entitled to summary judgment on Plaintiff's wrongful arrest claim.

### B. Reasonable Accommodation Theory:

A reasonable accommodation claim during arrest involves a failure of police to reasonably accommodate a qualified individual's disability in the course of an investigation or arrest. The Tenth Circuit recognizes reasonable accommodation claims as one type of ADA claim. *See Hans v. Bd. of Shawnee Cnty. Comm'rs*, 775 F. App'x 953, 960–61 (10th Cir. 2019) (unpublished) (Phillips, J., concurring in part and dissenting in part) (citing *J.V. ex rel. C.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1298 (10th Cir. 2016)). Likewise, the *Gohier* Court did not rule out the viability of a reasonable accommodating during arrest claim. *Cf. J.H.*, 806 F.3d at 1260–62 (assuming, without deciding, such causes of action exist). Other courts have also recognized reasonable accommodation claims in the arrest context. *See, e.g., Gorman,* 152 F.3d at 913 (finding that paraplegic arrestee properly alleged an ADA violation after suffering injuries while being transported to jail in a van not equipped for wheelchair transport); *Calloway v. Boro of Glassboro Dept. of Police*, 89 F. Supp. 2d 543, 555–56 (D.N.J. 2000) (finding that plaintiff stated a valid ADA claim where police questioned plaintiff at the station house without making a

reasonable accommodation for her deafness). Like the *J.H.* Court, this Court assumes that accommodations may be necessary when disabled individuals are arrested.

* * *

Defendants assert that summary judgment is appropriate on this claim because officers called paramedics twice when they suspected Plaintiff needed medical attention, tried to help Plaintiff up from where she fell on the ground, and removed Plaintiff's handcuffs. **Doc. 79 at 14 & Doc. 111 at 5**. Plaintiff, on the other hand, contends summary judgment is inappropriate as officers did not take Plaintiff to the hospital and failed to notify medical personnel of Plaintiff's seizure. **Doc. 103 at 10**.

The undisputed facts show that Officers Vitale, Lazarin, and Baker made reasonable modifications to accommodate Plaintiff's medical needs during the investigation and arrest. When Plaintiff indicated she might pass out, officers offered emergency medical services. Sergeant Baker called the Las Cruces Fire Department, informed them of her seizure condition upon arrival, and waited for paramedics to assess her. After determining her vitals were stable, Plaintiff declined transport to the hospital. And during the SFST—when Plaintiff complained of dizziness and requested to sit—the officers accommodated this request. Later, while detained at the Doña Ana County Sheriff's Office, Plaintiff experienced dizziness again. Officer Lazarin responded by offering her water, asking if she needed an ambulance, assisting her to stand, and removing her handcuffs. Even though Plaintiff declined medical assistance, the officers called paramedics (who again confirmed her vitals were stable).

Aside from her request to sit during the SFST, Plaintiff made no accommodation requests. Under the ADA, accommodations are required only if a public entity knows an individual needs them—either because the need is obvious or the individual requests it. *See Robertson v. Las*

36

*Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007). Here, Plaintiff did not request hospital transport and repeatedly refused it. Additionally, her need for hospitalization was not apparent, as paramedics twice confirmed her stable vitals. Thus, Plaintiff cannot establish officers had knowledge of any additional need for accommodation.[10]

Given that officers reasonably accommodated Plaintiff when they had knowledge of such need, the Court finds that Plaintiff cannot establish an ADA violation under a failure-to-accommodate during arrest theory.

### C. Negligent Training:

Turning to Plaintiff's failure-to-train claim under the ADA, the Tenth Circuit has yet to decide whether such a claim exists. Like the above claims, the Tenth Circuit has not explicitly recognized a failure-to-train claim under the ADA—but neither has it foreclosed the possibility. *See Gohier*, 186 F.3d at 1222 (explaining that the plaintiff "might have argued that Title II required Colorado Springs to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities"); *Sperry v. Maes*, 592 F. App'x 688, 698 (10th Cir. 2014) (unpublished) (dismissing the plaintiff's failure-to-train claim under ADA without deciding whether such a claim exists because the plaintiff failed to establish that defendant municipality acted with deliberate indifference, a required element for such claims).

Courts treat ADA failure-to-train claims the same as § 1983 failure-to-train claims asserting municipal liability. *J.V. ex rel. C.V.*, 813 F.3d at 1298. And the Tenth Circuit has set forth the following elements for a § 1983 failure to train claim asserting municipal liability:

1. "The existence of a county policy or custom involving deficient training;

---

[10] A police officer incurs a duty to reasonably accommodate a person's disability during an arrest only if he knows the individual needs an accommodation. *See J.H.*, 806 F.3d at 1261. But aside from Plaintiff's one request to sit during the SFST, no other accommodations were requested. This is fatal to her claim.

    2.   The policy or custom's causation of an injury;

    3.   The [city's] adoption of a policy or custom with deliberate indifference."

*Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021) (citing *Waller v. City & Cnty of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019). As to the third element, "deliberate indifference requires proof that a municipal actor disregarded a known or obvious consequence of his action." *Bradshaw v. Beaver Cnty.*, 32 F.4th 1246, 1253 (10th Cir. 2022) (citation omitted).

       There are two ways to establish deliberate indifference. A plaintiff can establish that a local government acted with deliberate indifference by showing "a pattern of similar constitutional violations by untrained employees." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Such evidence of a pattern of similar constitutional violations is "ordinarily necessary" to establish deliberate indifference. *Bradshaw*, 32 F.4th at 1254. However, the Tenth Circuit also recognizes at least one other way a plaintiff can establish that a local government acted with deliberate indifference: the single-incident standard. Under this standard, deliberate indifference may also be established on a "single-incident" of liability by showing that that single-incident was the obvious consequence of failing to provide training. *See Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) ("[T]he plaintiff must prove 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need' for additional training.").

       The Tenth Circuit has adopted a three-part test to determine whether deliberate indifference exists under the single-incident standard:

    1.   "[T]he county's policymakers know 'to a moral certainty' that [their] employees will confront a given situation."

2. "[T]he situation either presents the employee with a difficult choice of the sort that training, or supervision will make less difficult."

3. "[T]he wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights."

*Lance*, 985 F.3d at 802 (citing *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

* * *

The Court agrees with the City of Las Cruces that, based on the undisputed material facts, it has no custom or policy of inadequate training. **Doc. 79 at 15**. Las Cruces Police Department officers receive comprehensive training at the police academy on essential topics, including investigations, detentions, arrests, public interactions—particularly with individuals with disabilities—and ensuring public and arrestee safety. Officers also participate in ongoing education, departmental training, and hands-on field instruction. Las Cruces Police Department officers are also specifically trained to respond to medical emergencies by contacting on-duty EMTs, paramedics, or the fire department when necessary. When uncertain whether an individual is under the influence of drugs or alcohol, officers are instructed to administer SFSTs, conduct breathalyzer tests, and consult drug recognition experts. There are procedures in place for conducting sobriety and diagnostic tests and consulting drug recognition experts—meaning LCPD officers are equipped with tools distinguish medical conditions from substance-related impairment. As such, the Court finds that the City of Las Cruces provides adequate training.

But even if the City of Las Cruces's training was inadequate, the Court finds no deliberate indifference in adopting a policy or custom of insufficient training. Plaintiff fails to show a pattern of similar statutory violations by LCPD officers, and ADA violations are not the obvious result of a failure to train.

First, the law remains unsettled on whether mistaking disability symptoms for criminal behavior during an arrest constitutes an ADA violation. Therefore, the City of Las Cruces lacked notice that not training officers on distinguishing between the two would likely lead to ADA violations. Moreover, LCPD officers have access to medical personnel, SFSTs, breathalyzers, blood tests, and drug recognition experts to assess whether an individual is impaired or experiencing a medical condition. With these resources, policymakers could not know to a moral certainty that officers would need to make such determinations without these resources. Stated differently, mistaking signs of a medical condition or disability for criminal behavior is not an obvious result of the absence of specific training on this issue. Consequently, Defendants are entitled to summary judgment on Plaintiff's ADA failure-to-train claim.

* * * * *

For the reasons explained above, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment (**Doc. 79**) on Plaintiff's ADA claims.

## V. Defendants' Motion for Summary Judgment on Plaintiff's Negligent Supervision and/or Training Claims:

In their final Motion (**Doc. 80**), Defendants ask the Court to grant summary judgment on Plaintiff's negligent supervision claims—*viz.* Counts V and VIII.[11]

In Count V, Plaintiff alleges that the "City of Las Cruces failed to properly supervise and train Defendant Lazarin by supervising him in such a way that failed to identify obvious flaws in his investigation and encouraged him to charge innocent people with crimes without sufficient investigation." **Doc. 39 at 16**.

---

[11] As stated earlier, *see supra* n.4, the Complaint has two Count VIIIs. **Doc. 39 at 18–19**. This section deals with the first Count VIII which is captioned as "NEGLIGENT SUPERVISION and/or TRAINING." ***Ibid.***

In Count VIII, Plaintiff alleges that Defendant City of Las Cruces knew or should have known with moral certainty that their failure to properly train its officers on being able to identify a medical emergency versus a criminal action would have resulted in constitutional violations. **Doc. 39 at 18**. Plaintiff further alleges that the Defendant City of Las Cruces had a custom pattern or practice of ignoring medical emergencies amounting to deliberate indifference, and that the deliberate indifference of Defendant City of Las Cruces in ensuring their policies and procedures were followed through proper supervision resulted in Defendants Lazarin and Baker failing to ensure Plaintiff was free from false arrest and other constitutional violations. ***Id.***

### A. § 1983 Negligent Supervision and/or Training:

As discussed in detail above, *see supra* ¶ IV(C), a city or local government is not liable under § 1983 for negligent training unless a municipal policy causes a constitutional deprivation. Here, Plaintiff has not established a constitutional violation and, therefore, cannot satisfy the causation element of a § 1983 negligent training claim for municipal liability. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Moreover, even if a violation had occurred, the Court finds—consistent with its analysis of Plaintiff's failure-to-train claim under the ADA— that LCPD's training was adequate, and any insufficiency in training, if present, did not result from deliberate indifference.

Finally, regarding Plaintiff's claims against Defendant Rodriguez, the Court finds summary judgment appropriate. Defendant Rodriguez's authorization for Defendant Lazarin to call a DRE expert did not cause any of the alleged state or federal constitutional violations in the Complaint.

### B. NMTCA Negligent Supervision and/or Training:

Under the New Mexico Tort Claims Act, "a governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as

41

waived by Sections 41-4-5 through 41-4-12." And the immunity granted to governmental agencies and public employees under the NMTCA "does not apply" to liability under the following scenarios:

> [F]or personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978 § 41-4-12. Significantly, Section 41-4-12 makes no mention on its face—or through its construction by New Mexico courts—that immunity is waived for negligent training and/or supervision.

Instead, New Mexico courts have interpreted the "resulting from" language as encompassing any situation in which a law enforcement officer's actions "result" in injury from one of the enumerated intentional torts, even if the officer himself was not the one who committed the tort. *Dickson v. City of Clovis,* 2010-NMCA-058, ¶ 20, 148 N.M. 831, 242 P.3d 398 (N.M. Ct. App. 2010) ("[A]llegations of negligence based on one of the torts specified in Section 41-4-12 are appropriate only when a law enforcement officer's negligence allegedly caused a third party to commit one of the enumerated intentional acts."); *Methola v. Cnty. of Eddy, N.M.,* 1980-NMSC-145, ¶ 19, 95 N.M. 329, 622 P.2d 234 (N.M. 1980); *Weinstein v. City of Santa Fe,* 1996-NMSC-021, 121 N.M. 646, 916 P.2d 1313 (N.M. 1996).

Under these cases, the City of Las Cruces may be liable for any injury caused by an enumerated tort if its negligence led to its officers committing such a tort. But Plaintiff has not demonstrated that any enumerated tort occurred, so the City of Las Cruces's negligence— assuming it existed—cannot have caused any enumerated tort. Accordingly, the City of Las Cruces's immunity remains intact, and summary judgment is appropriate for this claim.

* * * * *

The Court **GRANTS** Defendants' Motion for Summary Judgment (**Doc. 80**) on Plaintiff's Negligent Supervision and/or Training Claims.

**VI. Additional Problems with Plaintiff's New Mexico Civil Rights Act Claims**

Although the Court went through each of Defendants' Motions for Summary Judgment in detail above, *see supra* ¶¶ I–V, another few words should be stated about the NMCRA claims. Plaintiff brings two claims under the New Mexico Constitution's Bill of Rights. *See* N.M. Const. art. II, § 10 & 18. She alleges deprivation of her right to be free from unreasonable seizures and malicious prosecution. *See* **Doc. 39 at ¶¶ 9, 118, 119, 123**.

To be sure, the NMCRA provides a cause of action to persons deprived of their rights under the New Mexico Constitution to take action against a public body. *See* NMSA 1978 § 41-4A-3; *see also Bolen v. N.M. Racing Comm'n*, 2024-NMCA-056, ¶ 10, 553 P.3d 492 (N.M. Ct. App. 2024); *McKinzie v. Bank of Am.*, No. 24-cv-892, 2025 U.S. Dist. LEXIS 49535, at *7–8 (D.N.M. Mar. 17, 2025) (Johnson, J.). However, Plaintiff's unreasonable seizure claim in Count I alleges violations by individual officers. *See* **Doc. 39 at ¶¶ 117–121**. And in Count II, the malicious prosecution claim focuses on discreet actions by a specific officer. *Id.* **at ¶¶ 122–131**. Apparently both claims are brought against individual Defendants. Consequently, Counts I and II are barred by the statute itself. *See* NMSA 1978 § 41-4A-3(C) ("Claims brought pursuant to the New Mexico Civil Rights Act ***shall*** be brought ***exclusively*** against a public body." (emphasis added)); *see also Lowrey v. Mosley*, No. 23-cv-868, 2024 U.S. Dist. LEXIS 177870, at *16–17 (D.N.M. Sept. 30, 2024); *Trujillo v. City of Albuquerque*, No. 23-cv-314, 2024 U.S. Dist. LEXIS 199415, at *29 (D.N.M. Nov. 1, 2024); *Gutierrez v. Doña Ana Cnty. Bd. of Comm'rs*, No. 24-cv-428, 2025 U.S. Dist. LEXIS 62498, at *12–14 (D.N.M. Mar. 31, 2025).

Additionally, the NMCRA claims were not brought until after this case was removed to federal court. *Compare* **Doc. 1** (not asserting any NMCRA claims), *with* **Doc. 39** (alleging violations of the NMCRA). This is also fatal. As United States Magistrate Judge Jennifer Rozzoni recently explained: "Claims under the New Mexico Civil Rights Act must first be filed in New Mexico state court . . . . Because plaintiff filed his New Mexico Civil Rights Act claims in federal court, as opposed to New Mexico state court, this Court lacks jurisdiction over the claims." *Way v. Facility*, No. 23-cv-223, 2025 U.S. Dist. LEXIS 45173, at *11–12 (D.N.M. Mar. 11, 2025) (citing cases); *cf. Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1181 (D.N.M. 2021).

In this case, summary judgment is appropriate on these causes of action because: (1) there is no genuine dispute as to any material fact, and (2) Defendants are entitled to judgment as a matter of law. The Court simply notes that if Defendants had filed a motion to dismiss the NMCRA claims in the Amended Complaint (**Doc. 39**) for lack of jurisdiction, that would have been granted. Either way, these claims do not survive.

## CONCLUSION

The Court **GRANTS** Defendants' Motions for Summary Judgment on Plaintiff's: (1) unreasonable seizure, (2) false arrest and battery, (3) malicious prosecution and abuse of process, (4) and negligent supervision and/or training claims. *See* **Docs. 75, 77, 78, 80**. Defendants' Motion for Summary Judgment on Plaintiff's ADA claims, *see* **Doc. 79**, is **GRANTED in part** and **DENIED in part**—leaving only Plaintiff's ADA claim for wrongful arrest.

**IT IS SO ORDERED.**

/s/

_____

WILLIAM P. JOHNSON
SENIOR UNITED STATES DISTRICT JUDGE